**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| **PAMELA V.,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **CIVIL ACTION FILE NO.** |
| **v.** | : | **1:17-cv-04302-AJB** |
| | : | |
| **COMMISSIONER, SOCIAL** | : | |
| **SECURITY ADMINISTRATION,** | : | |
| | : | |
| **Defendant.** | : | |

### <u>O R D E R   A N D   O P I N I O N</u>[1]

Plaintiff Pamela V. ("Plaintiff") brought this action pursuant to section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to obtain judicial review of the final decision of the Commissioner of the Social Security Administration ("the Commissioner") denying her application for Disability Insurance Benefits ("DIB")

---

[1]     The parties have consented to the exercise of jurisdiction by the undersigned pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure. (*See* Dkt. Entry dated 10/30/17). Therefore, this Order constitutes a final Order of the Court.

under the Social Security Act.[2]  For the reasons below, the undersigned **AFFIRMS** the final decision of the Commissioner.

## I.     PROCEDURAL HISTORY

Plaintiff filed an application for DIB on or about January 12, 2014, alleging disability commencing on March 30, 2012.  [Record (hereinafter "R") 187].  Plaintiff's application was denied initially and on reconsideration.  [*See* R109-10].  Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ").  [R153-54].  An evidentiary hearing was held on May 4, 2016, during which Plaintiff amended her onset date to March 6, 2011.  [R59-77].  The ALJ issued a decision on August 1, 2016, denying Plaintiff's application on the ground that she had not been under a "disability"

---

[2]      Title II of the Social Security Act provides for federal Disability Insurance Benefits.  42 U.S.C. § 401 *et seq*.  Title XVI of the Social Security Act, 42 U.S.C. § 1381, *et seq*., provides for Supplemental Security Income Benefits for the disabled ("SSI").  Title XVI claims are not tied to the attainment of a particular period of insurance eligibility.  *Baxter v. Schweiker*, 538 F. Supp. 343, 350 (N.D. Ga. 1982).  Otherwise, the relevant law and regulations governing the determination of disability under a claim for DIB are nearly identical to those governing the determination under a claim for SSI.  *Wind v. Barnhart*, 133 Fed. Appx. 684, 690 n.4 (11th Cir. June 2, 2005) (citing *McDaniel v. Bowen*, 800 F.2d 1026, 1031 n.4 (11th Cir. 1986)).  Thus, in general, the legal standards to be applied are the same regardless of whether a claimant seeks DIB, to establish a "period of disability," or to recover SSI, although different statutes and regulations apply to each type of claim.  *See* 42 U.S.C. § 1383(c)(3) (establishing that the judicial provisions of 42 U.S.C. § 405(g) are fully applicable to claims for SSI).  Therefore, to the extent that the Court cites to SSI cases, statutes, or regulations, they are equally applicable to Plaintiff's DIB claims.

2

at any time from March 6, 2011, through March 31, 2016, the date Plaintiff was last insured. [R18-45]. Plaintiff sought review by the Appeals Council, and the Appeals Council denied Plaintiff's request for review on July 11, 2017, making the ALJ's decision the final decision of the Commissioner. [R13-17].

Plaintiff then filed an action in this Court on October 27, 2017, seeking review of the Commissioner's decision. [Doc. 1]. The answer and transcript were filed on March 14, 2018. [*See* Docs. 5, 6]. On April 10, 2018, Plaintiff filed a brief in support of her petition for review of the Commissioner's decision, [Doc. 10]; on May 10, 2018, the Commissioner filed a response in support of the decision, [Doc. 11]; and on May 31, 2018, Plaintiff filed a reply brief in support of her petition for review, [Doc. 14]. The matter is now before the Court upon the administrative record, the parties' pleadings, and the parties' briefs,[3] and it is accordingly ripe for review pursuant to 42 U.S.C. § 405(g).

## II.    STANDARD FOR DETERMINING DISABILITY

An individual is considered disabled for purposes of disability benefits if he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death

---

[3]    Neither party requested oral argument. (*See* Dkt.).

AO 72A
(Rev.8/8
2)

or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment or impairments must result from anatomical, psychological, or physiological abnormalities which are demonstrable by medically accepted clinical or laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do previous work but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful work that exists in the national economy. 42 U.S.C. § 423(d)(2)-(3).

The burden of proof in a Social Security disability case is divided between the claimant and the Commissioner. The claimant bears the primary burden of establishing the existence of a "disability" and therefore entitlement to disability benefits. *See* 20 C.F.R. § 404.1512(a). The Commissioner uses a five-step sequential process to determine whether the claimant has met the burden of proving disability. *See* 20 C.F.R. § 404.1520(a); *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001); *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999). The claimant must prove at step one that he is not undertaking substantial gainful activity. *See* 20 C.F.R. § 404.1520(a)(4)(i). At step two, the claimant must prove that he is suffering from a severe impairment or combination of impairments that significantly limits his ability to perform basic work-related activities. *See* 20 C.F.R. § 404.1520(a)(4)(ii). At step three, if the

4

impairment meets one of the listed impairments in Appendix 1 to Subpart P of Part 404 (Listing of Impairments), the claimant will be considered disabled without consideration of age, education, and work experience. *See* 20 C.F.R. § 404.1520(a)(4)(iii). At step four, if the claimant is unable to prove the existence of a listed impairment, he must prove that his impairment prevents performance of past relevant work. *See* 20 C.F.R. § 404.1520(a)(4)(iv). At step five, the regulations direct the Commissioner to consider the claimant's residual functional capacity, age, education, and past work experience to determine whether the claimant can perform other work besides past relevant work. *See* 20 C.F.R. § 404.1520(a)(4)(v). The Commissioner must produce evidence that there is other work available in the national economy that the claimant has the capacity to perform. *Doughty*, 245 F.3d at 1278 n.2. To be considered disabled, the claimant must prove an inability to perform the jobs that the Commissioner lists. *Id*.

If at any step in the sequence a claimant can be found disabled or not disabled, the sequential evaluation ceases and further inquiry ends. *See* 20 C.F.R. § 404.1520(a)(4). Despite the shifting of burdens at step five, the overall burden rests on the claimant to prove that he is unable to engage in any substantial gainful activity that exists in the national economy. *Doughty*, 245 F.3d at 1278 n.2;

5

*Boyd v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds by* 42 U.S.C. § 423(d)(5), *as recognized in Elam v. R.R. Ret. Bd.*, 921 F.2d 1210, 1214 (11th Cir. 1991).

## III.   SCOPE OF JUDICIAL REVIEW

A limited scope of judicial review applies to a denial of Social Security benefits by the Commissioner.  Judicial review of the administrative decision addresses three questions:  (1) whether the proper legal standards were applied; (2) whether there was substantial evidence to support the findings of fact; and (3) whether the findings of fact resolved the crucial issues.  *Washington v. Astrue*, 558 F. Supp. 2d 1287, 1296 (N.D. Ga. 2008); *Fields v. Harris*, 498 F. Supp. 478, 488 (N.D. Ga. 1980).  This Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005).  If substantial evidence supports the Commissioner's factual findings and the Commissioner applies the proper legal standards, the Commissioner's findings are conclusive.  *Lewis v. Callahan*, 125 F.3d 1436, 1439-40 (11th Cir. 1997); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987) (per curiam);

AO 72A
(Rev.8/8
2)

*Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986) (per curiam); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

"Substantial evidence" means "more than a scintilla, but less than a preponderance." *Bloodsworth*, 703 F.2d at 1239. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, and it must be enough to justify a refusal to direct a verdict were the case before a jury. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Hillsman*, 804 F.2d at 1180; *Bloodsworth*, 703 F.2d at 1239. "In determining whether substantial evidence exists, [the Court] must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986) (per curiam). Even where there is substantial evidence to the contrary of the ALJ's findings, the ALJ decision will not be overturned where "there is substantially supportive evidence" of the ALJ's decision. *Barron v. Sullivan*, 924 F.2d 227, 230 (11th Cir. 1991). In contrast, review of the ALJ's application of legal principles is plenary. *Foote v. Chater*, 67 F.3d 1553, 1558 (11th Cir. 1995); *Walker*, 826 F.2d at 999.

7

AO 72A
(Rev.8/8
2)

## IV.    STATEMENT OF FACTS[4]

### A.    *Background*

Plaintiff was 47 years old on her amended alleged onset date and 52 years old on her date last insured of March 31, 2016.  [R63, 187, 193].  She has a college degree and previously worked as a claims examiner and an administrative assistant.  [R71, 75, 219].  She also served in the Air Force Reserves until she was honorably discharged in 2011.  [R64, 289, 438].  Plaintiff alleges she is unable to work because of  degenerative disk disease, chest pain, fatigue, cardiomyopathy,[5] coronary artery disease,[6] sleep apnea, anxiety, depression, and hypertension.  [R63, 65-66, 218].

---

[4]    In general, the records referenced in this Order and Opinion are limited to those deemed by the parties to be relevant to this appeal.  [*See* Docs. 10, 11, 14; *see also* Doc. 8 (Sched. Ord.) at 3 ("The issues before the Court are limited to the issues properly raised in the briefs.")].  Where a party's page numbering conflicts with the page numbers assigned by the Court's electronic filing system, the Court's citations will utilize the page numbering assigned by the Court's electronic filing system.

[5]    Cardiomyopathy is the name for diseases of the heart muscle. MedlinePlus, Cardiomyopathy, https://medlineplus.gov/cardiomyopathy.html (last visited 3/11/19).

[6]    Coronary heart disease is the most common type of heart disease.  It happens when the arteries that supply blood to the heart muscle become hardened and narrowed.  MedlinePlus, Coronary Artery Disease, https://medlineplus.gov/coronaryarterydisease.html (last visited 3/11/19).

AO 72A
(Rev.8/8
2)

**B.    Lay Testimony**

In the hearing before the ALJ, Plaintiff testified that she was diagnosed with cardiomyopathy in 2009 and got a defibrillator in August 2010. [R65]. She stated that she lives with chest pain and increased fluid on her lungs, to the point where she chokes in her sleep and has daily wheezing. [R65]. She reported that her energy level is very low, she needs breaks when climbing as few as six stairs, and she has increasing fatigue. [R65]. She also testified that she has severe low blood pressure and that her heart medication has blood-pressure-lowering elements in it, so it is constantly pushing her blood pressure down in the "danger zone," which is more of a strain on her heart. [R65-66]. When asked about noncompliance with medication, she stated that she has periodically adjusted her medications depending on how she is feeling; for example, her heart medication causes her blood pressure to drop to very low levels, so she sometimes cuts back on it, and she sometimes takes her diuretics at night to avoid the need for frequent bathroom visits during the day. [R65, 67].

Plaintiff also related that she had been diagnosed with sleep apnea and used a CPAP[7] device for sleeping, especially with all the wheezing she had. [R66]. She stated

_____

[7]        "CPAP" is also known as continuous positive airway pressure. CPAP treatment is used to treat breathing-related sleep disorders and works by applying mild air pressure to keep the breathing airways open. Nat'l Heart, Lung, & Blood Institute,

AO 72A
(Rev.8/8
2)

that when she sits, her chest starts to feel fatigued—like a "pulling" in her chest—and she has to lie down.  [R66-67].

Plaintiff additionally testified that her daily activities vary depending on her symptoms.  [R67-68].  She lies down during the day with a variable frequency.  [R67].  She reported that a lot of it has to do with excess fluid buildup:  the fluid buildup in her lungs makes her fatigued, [R69], so she takes diuretics and is constantly going to the bathroom—four to five times an hour.  [R67].  After sitting up she has to lie down for a couple hours until she gets some energy and starts feeling better, and then she can get up and do whatever she has to do for the day or around the house.  [R67].  She stated that she does not cook much anymore, but she does household chores and errands.  [R68].  She reported that some days she does not go out at all, and when she is out she tries to do whatever she has to do so that she does not have to go out for days at a time.  [R67].

## C.    *Administrative Records*

In an adult function report dated February 19, 2014, Plaintiff reported that she drove, shopped for groceries, and did chores, although the chores took longer because

---

CPAP,   https://www.nhlbi.nih.gov/health/health-topics/topics/cpap   (last   visited 3/11/19).

AO 72A
(Rev.8/8
2)

of chest agitation and fatigue. [R227-28]. She also indicated that she needed no assistance in managing her activities of daily living, including personal hygiene, dress, and toilet use. [R227-31].

### D.   *Medical Records*

In 1999, Plaintiff was diagnosed with non-Hodgkin's lymphoma and was treated with chemotherapy. [R311, 317, 321, 328]. After chemotherapy, she developed secondary cardiomyopathy with an ejection fraction[8] of fifteen percent. [R525]. In January 2005, she had moderate cardiomyopathy with a left ventricular ejection fraction of thirty percent without significant valvular disease. [R318]. An echocardiogram in 2009 showed an ejection fraction of fifteen to twenty percent. [R318]. In August 2010, she had an automatic implantable cardiac defibrillator placed in her chest. [R318, 328]. In September 2011, it was noted that Plaintiff had no evidence of congestive heart failure or fluid overload at that time. [R318].

---

[8]     The ejection fraction is a measurement of the percentage of blood leaving the heart each time it contracts. A left-ventricle ejection fraction of 55 percent or higher is considered normal, and a left-ventricle ejection fraction of 50 percent or lower is considered reduced. Mayo Clinic, What Does the Term "Ejection Fraction" Mean? What Does it Measure?, https://www.mayoclinic.org/ejection-fraction/expert-answers/FAQ-20058286?p=1 (last visited 3/11/19).

AO 72A
(Rev.8/8
2)

Notes from a new patient examination taking place on August 24, 2012, with Karen Y. Luster, M.D., of Capstone Medical Group, indicate that Plaintiff complained of dizzy spells, joint pain, loud snoring, sleepiness, weight gain, wheezing, shortness of breath, palpitations, chest pain, back pain, nocturia, headache, insomnia, memory loss, blurry vision, leg edema, and fatigue. [R297-300]. Plaintiff's ejection fraction had improved to twenty-five percent. [R300].

At an appointment with Dr. Luster taking place on October 3, 2012, Plaintiff reported that her equilibrium felt off, she had fallen from a stepladder, and she was having difficulty walking due to knee pain from the fall. [R301-02]. She was noted to be limping and was diagnosed with "pain and limb," and it was also noted that her congestive heart failure restricted medication options. [R302]. Dr. Luster prescribed tramadol.[9] [R302].

Plaintiff presented to the VA Medical Center on January 8, 2013, with complaints of intermittent chest pain that was worse when she was overly tired. [R379]. She reported that her energy level fluctuated and that she had occasional shortness of breath and dizziness with lying down, sitting up, or driving, with an

---

[9] Tramadol is in a class of medications called opiate (narcotic) analgesics and is used to relieve moderate to moderately severe pain. MedlinePlus, Tramadol, http://medlineplus.gov/druginfo/meds/a695011.html (last visited 3/11/19).

increase in events in the last year. [R379]. She also reported anxiety with stress. [R380].

VA Medical Center mental-health evaluation notes from January 23, 2013, indicate that in the late 1980s, Plaintiff was in a car crash in which her car slid under a tractor-trailer, she suffered injuries, and she had to be cut from her vehicle. [R365]. She reported that since that time she has experienced flashbacks and extreme anxiety, particularly when driving. [R365]. She indicated that her anxiety became so great that she limited her driving and finally sought treatment in 2013. [R365].

At a visit to the VA Medical Center taking place on January 24, 2013, Plaintiff reported that she was intermittently compliant with her medications and was not taking her statin. [R359]. She also stated that she had shortness of breath with one flight of stairs; intermittent sharp sub-sternal chest pain without provocation; intermittent palpitations; "fluttering"; and intermittent dizziness. [R359, 362]. Her examination showed normal heart and lung readings and no pedal edema. [R361]. She was

13

switched to Toprol[10] and advised to be compliant with the rest of her medications, and her doctors considered increasing her losartan[11] and discontinuing digoxin.[12] [R361].

A stress test taking place at the VA Medical Center on January 30, 2013, revealed no significant perfusion defects and normal wall motion, and the left ventricular ejection fraction was calculated at 58 percent. [R338-39, 390]. The test was characterized as a "normal myocardial perfusion study." [R339, 390].

Notes from April 29, 2013, indicate that Plaintiff was out of digoxin and called to reorder multiple medications through the VA with some difficulty. [R352-54].

---

[10]     Toprol (metoprolol) is in a class of medications called beta blockers and is used to treat high blood pressure, heart pain, and heart failure and to improve survival after a heart attack. It works by relaxing blood vessels and slowing heart rate to improve blood flow and decrease blood pressure. MedlinePlus, Metoprolol, https://medlineplus.gov/druginfo/meds/a682864.html (last visited 3/11/19).

[11]     Losartan is in a class of medications called angiotensin II receptor antagonists and is used to treat high blood pressure and to decrease the risk of stroke in people who have high blood pressure and the heart condition left ventricular hypertrophy. It works by blocking the action of certain natural substances that tighten the blood vessels, allowing the blood to flow more smoothly and the heart to pump more efficiently. MedlinePlus, Losartan, https://medlineplus.gov/druginfo/meds/a695008.html (last visited 3/11/19).

[12]     Digoxin is used to treat heart failure, abnormal heart rhythms, and heart pain. MedlinePlus, Digoxin, https://medlineplus.gov/druginfo/meds/a682301.html (last visited 3/11/19).

AO 72A
(Rev.8/8
2)

Plaintiff returned to the VA Medical Center cardiology clinic for follow-up on May 1, 2013. [R341]. Her problem list included New York Heart Association ("NYHA") class III cardiomyopathy[13] and coronary atherosclerotic heart disease—one-vessel disease with left-heart catheterization in 2009.[14] [R336]. She said she was doing well and had recently been in New York, caring for an uncle, [R336], although she also reported chest pain that had been ongoing for four to five weeks and chronic problems of dizziness and shortness of breath when going up stairs, [R341, 345]. She indicated that she ran out of digoxin at that time but had no chest pain, shortness of breath, palpitations, orthopnea or PND (paroxysmal nocturnal dyspnea), and stated that she was otherwise compliant with her medications. [R336].

---

[13]    NYHA class III patients are "Patients with cardiac disease resulting in marked limitations of physical activity. They are comfortable at rest. Less than ordinary activity causes fatigue, palpitation, dyspnea, or anginal pain." Am. Heart Ass'n, Prof'l Heart Daily, *available at* https://professional.heart.org/professional/General/UCM_423811_Classification-of-Functional-Capacity-and-Objective-Assessment.jsp (last visited 3/11/19).

[14]    Single-vessel disease refers to coronary heart disease in which one coronary artery has significant narrowing. Single Vessel Disease, *Segen's Med. Dictionary* (2012 ed.), *available at* https://medical-dictionary.thefreedictionary.com/single-vessel+disease (last visited 3/11/19).

AO 72A
(Rev.8/8
2)

She had a normal examination, and because she was using furosemide (Lasix) daily,[15] supplemental potassium was recommended.  [R347].

On July 11, 2013, VA Medical Center cardiologist Brian Kaebnick, M.D., indicated that Plaintiff had two recent cardiac tests: a nuclear stress test on January 30, 2013, to evaluate her coronary arteries, and a repeat echocardiogram in June 2013. [R327].  The nuclear stress test indicated an ejection fraction of 58 percent and did not show any large areas of ischemia, and the repeat echocardiogram indicated an ejection fraction of 35 to 40 percent.  [R327].  The doctor noted that ejection fractions measured during nuclear stress tests may be falsely elevated and stated that the echocardiogram more accurately reflected Plaintiff's current cardiac function and therefore would be used to grade her heart dysfunction.  [R327].

Cardiology progress notes dated July 11, 2013, indicate that Plaintiff had been started on Imdur[16] on her last visit but could not tolerate it due to headaches.  [R328].

_____

[15]     Lasix (furosemide) is a strong diuretic ("water pill") often used to treat high blood pressure and fluid retention.  It works by causing the kidneys to get rid of water and salt into the urine.  MedlinePlus, Furosemide, https://medlineplus.gov/druginfo/meds/a682858.html (last visited 3/11/19).

[16]     Imdur (isosorbide) is in a class of medications called vasodilators and is used to prevent chest pain in people who have coronary artery disease.  It works by relaxing the blood vessels so that the heart does not need to work as hard and therefore needs less oxygen.  MedlinePlus, Isosorbide,

AO 72A
(Rev.8/8
2)

She reported that she continued to have angina symptoms with moderate activities like cleaning floors or raking leaves that abated with rest. [R328]. It was noted that although she continued to experience angina pain, she had some improvement in her ejection fraction after she started congestive heart failure medications, was stable, and did not want to try a new medication. [R331]. Sublingual nitroglycerine[17] was prescribed for use as needed. [R331].

A DeKalb Community Service Board assessment dated September 27, 2013, indicates that Plaintiff reported being active but tiring easily from her heart condition. [R292].

Plaintiff returned to Dr. Luster on December 11, 2013, with complaints of sharp chest pain with exertion and fatigue that had lasted for two weeks. [R304]. She reported that she had to sit for 30 minutes once before she could do much. [R304]. She also reported that she was "doing a cleanse" and therefore had stopped her medications. [R304]. Examination revealed that her lungs were clear, jugular venous distension was

─────────────────────

https://medlineplus.gov/druginfo/meds/a682348.html (last visited 3/11/19).

[17]    Sublingual nitroglycerin is in a class of medications called vasodilators and is used to treat chest pain in people who have coronary artery disease. It works by relaxing the blood vessels so that the heart does not need to work as hard and therefore needs less oxygen. MedlinePlus, Nitroglycerin Sublingual, https://medlineplus.gov/druginfo/meds/a601086.html (last visited 3/11/19).

AO 72A
(Rev.8/8
2)

flat,[18] she had +1-2 edema in both her legs,[19] and she was tender to palpation from the right breast radiating from the sternum to 2 o'clock.  [R304].  For her fatigue/malaise, she was directed to stop Cymbalta delayed release capsule[20] and start escitalopram,[21] [R304]; for her congestive heart failure, she was directed to continue digoxin, losartan, spironolactone,[22] and furosemide, [R305]; her chest pain was attributed to two possible

_____

[18]    A bulging jugular vein can indicate congestive heart failure.  Solomon Branch, *Bulging Left Jugular with Increased Exercise*, https://www.livestrong.com/article/550378-bulging-left-jugular-with-increased-exercise/ (last visited 3/11/19).

[19]    Pitting edema is measured on a scale of 1+ to 4+:  it is recorded as 1+ where a finger pressed into the skin leaves a barely detectable impression, and it is recorded as 4+ where a finger leaves a deep imprint that only slowly returns to normal. *Lippincott Manual of Nursing Practice Series: Assessment* 60 (Amy L. Moshier ed., 2007).

[20]    Cymbalta (duloxetine) is often used to treat depression, generalized anxiety disorder, or pain, including pain caused by fibromyalgia, osteoarthritis, and diabetic neuropathy.  It works by increasing the amounts of serotonin and norepinephrine, natural substances in the brain that help maintain mental balance and stop the movement of pain signals in the brain.  MedlinePlus, Duloxetine, https://medlineplus.gov/druginfo/meds/a604030.html (last visited 3/11/19).

[21]    Escitalopram, often marketed under the brand name Lexapro, is used to treat depression and generalized anxiety disorder.  It is in a class of antidepressants called selective serotonin reuptake inhibitors ("SSRIs") and works by increasing the amount of serotonin in the brain.  MedlinePlus, Escitalopram, https://medlineplus.gov/druginfo/meds/a603005.html (last visited 3/11/19).

[22]    Spironolactone is in a class of medications called aldosterone receptor antagonists and is used to treat certain patients with hyperaldosteronism (the body

18

components—post-surgical pain and anxiety—and she was to start Cymbalta, [R305]; and for her anxiety disorder, she was directed to attend counseling, use "sleepy time" tea, and use melatonin as needed, [R305].

When Plaintiff returned to Dr. Luster on January 8, 2014, her chest pain symptoms had improved, she was sleeping better, and she felt rested. [R306]. Plaintiff reported that she had been told that she only had sleep apnea symptoms when she slept on her back. [R306]. Her examination was normal. [R306]. She was diagnosed with anxiety disorder, NOS; chest pain; and fatigue/malaise. [R306]. Proper positioning was encouraged for her positional obstructive sleep apnea. [R306].

Sleep testing taking place on March 3, 2014, showed that Plaintiff had a good response to CPAP for her sleep apnea. [R407-18].

On March 6, 2014, Plaintiff returned to Dr. Kaebnick at the VA Medical Center cardiology clinic. [R420]. She reported that she had mixed anginal and musculoskeletal chest pain but was doing well and had no significant changes in her

---

produces too much aldosterone, a naturally occurring hormone); low potassium levels; and heart failure; and in patients with edema (fluid retention) caused by various conditions, including liver, or kidney disease. It is also used alone or with other medications to treat high blood pressure. It causes the kidneys to eliminate unneeded water and sodium from the body into the urine but reduces the loss of potassium from the body. MedlinePlus, Spironolactone, https://medlineplus.gov/druginfo/meds/a682627.html (last visited 3/11/19).

AO 72A
(Rev.8/8
2)

chest pain, and the pain was not very limiting in her daily life. [R420]. She also reported that because of her fatigue, she referred herself for a sleep study and was diagnosed with obstructive sleep apnea, for which she would be prescribed a CPAP mask. [R420]. Dr. Kaebnick noted that Plaintiff continued to have CCS I angina[23] that was stable and that she did not want to try a new medication at that time. [R423].

Also on March 6, 2014, the VA found that Plaintiff had a service-connected disability rating of 30 percent, with lumbosacral or cervical strain rated at ten percent, tendon inflammation rated at ten percent, and superficial scars rated at ten percent. [R475-76]. Her ventricular arrhythmias (sustained) and cervix-disease or injury were each rated at zero percent. [R476].

Plaintiff underwent a consultative physical examination with Tiffany Strawbridge Lee, M.D. ("Dr. Strawbridge"), on March 19, 2014. [R429-36]. Notes indicate that Plaintiff reported that she was able to independently dress, feed herself, use the toilet, clean, do laundry, iron, prepare meals, and shop. [R430].

---

[23] This note appears to reference Canadian Cardiovascular Society Grade I angina. In people with CCS I angina, ordinary physical activity, such as walking or climbing stairs, does not cause angina, but strenuous, rapid, or prolonged exertion does cause angina. Canadian Cardiovascular Society Grading of Angina Pectoris, http://www.ccs.ca/images/Guidelines/Guidelines_POS_Library/Ang_Gui_1976.pdf (last visited 3/11/19).

20

AO 72A
(Rev.8/8
2)

Dr. Strawbridge stated that Plaintiff had been reminded that uncontrolled hypertension could lead to an increased risk of heart attack, stroke, kidney disease, and death, and that based on the examination, Plaintiff was expected to take all medications as prescribed and to keep all scheduled appointments. [R432]. Dr. Strawbridge also noted that Plaintiff had a decreased range of motion in her back during the evaluation and advised that Plaintiff avoid activities requiring excessive bending and heavy lifting until further evaluation had been completed and treatment options had been considered. [R432].

Plaintiff underwent a consultative physical examination with Debra Lewis, Ph.D., on March 20, 2014. [R437-41]. Plaintiff reported that she lives with her husband and stepson; does not need assistance managing her activities of daily living; is able to complete her hygiene, dress, and toilet without assistance; can choose clothing appropriate to the situation and season; cooks and does chores on a regular basis; can shop and manage money; pays her bills online; drives several times per week to shop, goes to appointments, and runs errands; can navigate public transportation without assistance; has three or four close friends that she sees monthly; attends church; sings in the choir and attends choir rehearsal once per week; spends her time watching TV and doing chores; and does not need to consult with others for decision making,

21

organizing, or planning. [R438]. Dr. Lewis noted that there were some inconsistencies in Plaintiff's report, such as activities of daily living that were not consistent with her report of symptoms. [R439-40]. Dr. Lewis's diagnostic impression was malingering. [R440]. Dr. Lewis opined that Plaintiff is able to understand, remember, and follow one- and two-step instructions; her attention and concentration are likely sufficient to satisfy the demands of elementary production norms; there is nothing to suggest she would not be able to get along with the public, supervisors, and coworkers; and she should be able to adapt to most typical workplace stressors. [R440].

During a medication reconciliation taking place at the VA Medical Center on April 23, 2014, it was discovered that Plaintiff was still taking isosorbide, which had been discontinued by cardiology because of headaches. [R530]. Plaintiff was advised to stop taking the medication and told to take sublingual nitroglycerine if her chest pain recurred. [R530].

On August 18, 2014, Elizabeth J. Tong, M.D., of the VA Medical Center, provided a medical-source statement. [R476, 543-44]. She stated that Plaintiff has chest pain and heart failure and opined that she could not reasonably be expected to be reliable in attending an eight-hour day, 40-hour workweek, week after week, without missing more than two days per month; she has limitations in sitting because her feet

22

swell; she could occasionally lift and carry up to 20 pounds, but never more; she could occasionally bend and push/pull; her conditions cause severe pain; she needs to elevate her legs every three hours for 30 minutes or more; Plaintiff has a medical need to lie down due to pain, fatigue, or other impairments; she would be off task, at times up to 50 percent of the day, due to her conditions; she was frequently precluded from performing activities within a schedule, maintaining regular attendance, and sustaining an ordinary routine; and she was occasionally precluded from understanding and remembering detailed instructions. [R543-44]. Dr. Tong also opined that Plaintiff's sleep was adversely affected by her conditions and that it was reasonable that her conditions or medication would cause lapses in memory and/or concentration. [R544].

A chest CT taken on March 23, 2016, showed no appreciable change in a heavily calcified ovoid nodular density abutting the pleura at the left lung base, which favored a benign etiology. [R667]. There was also a new right-sided pleural effusion tracking along the major fissure and layering at the right lung base; scattered abdominally sub-pleural pulmonary nodules stable since December 16, 2014; stable areas of pleural thickening and parenchymal scarring; stable mild centrilobular emphysema; stable calcification in the prevascular space/anterior mediastinum; and stable changes associated with prior median sternotomy. [R667].

23

On April 18, 2016, Plaintiff presented to the VA Medical Center emergency room with complaints of worsening wheezing and shortness of breath that woke her. [R659-62]. She reported that she had been having worsening wheezing for six weeks but that it was the worst that morning when she woke up choking. [R662]. She stated that she frequently had chest pain that she characterized as either exertional or pressure/stress; that her current chest pain was not related to her breathing problems; and that she had taken a double of dose of Lasix that morning, and it helped alleviate her wheezing. [R662]. She also indicated that she normally took Lasix at night but had not taken it recently. [R662]. She additionally reported that a recent CT had resulted in a diagnosis of a mass in her lung and that she was concerned about it. [R662].

She had an abnormal ECG with sinus tachycardia, V-rate greater than 99,[24] probable left atrial abnormality, and probable left ventricular hypertrophy. [R631]. A chest x-ray showed that Plaintiff's cardiac silhouette was enlarged and there was

---

[24] Sinus tachycardia is typically a normal increase in heart rate that happens with fever, excitement, and exercise. Heart Rhythm Soc'y, Heart Diseases & Disorders, https://www.hrsonline.org/Patient-Resources/Heart-Diseases-Disorders (last visited 3/11/19).

24

AO 72A
(Rev.8/8
2)

atelectasis[25] present with no evidence of a focal consolidation or pleural effusion. [R667-68].

Examination revealed a moderate hepatojugular reflux with palpation of the abdomen; Plaintiff's lungs were clear; her heart had a regular rate and rhythm, positive S1 and S2, no S3 or S4, and no murmurs, rubs, or gallops[26]; and she had no edema. [R664]. It was noted that Plaintiff briefly had symptoms of PND (paroxysmal nocturnal dyspnea)[27] and wheezing; that on examination, she was found to have elevated jugular venous distension and loud P2[28] suggestive of decompensated congestive heart failure; and that she had not taken her metoprolol that day and was

_____

[25] Atelectasis is a condition in which one or more areas of the lungs collapse or do not inflate properly. Nat'l Heart, Lung, & Blood Inst., Atelectasis, https://www.nhlbi.nih.gov/health-topics/atelectasis (last visited 3/11/19).

[26] S1, S2, S3, and S4 refer to various heart sounds. William K. Freeman, M.D., The Four Heart Sounds (S1, S2, S3, S4), *available at* https://www.mayo.edu/blackboard/MCSOM/ARZ/The_Four_Heart_Sounds_ (S1,S2,S3,S4).pptx (last visited 3/11/19).

[27] Paroxysmal nocturnal dyspnea is a type of breathing difficulty while lying down. The condition causes a person to wake up suddenly during the night feeling short of breath. MedlinePlus, Breathing Difficulty - Lying Down, https://medlineplus.gov/ency/article/003076.htm (last visited 3/11/19).

[28] This notation appears to refer to the pulmonic second heart sound. P2, *Med. Abbreviations: 24,000 Conveniences at the Expense of Comm'ns & Safety* 246 (11th ed. 2003).

AO 72A (Rev.8/8 2)

erratic in taking her diuretics. [R668]. Her workup was negative except for elevated BNP,[29] which was noted to be inconsistent with her physical exam and history. [R668]. She was diagnosed with congestive heart failure, mild decompensation; was advised to take her usual dose of Lasix and potassium pills and start metoprolol the following day; and was told to take her medication on a regular basis and to follow up with her primary care physician for further care. [R659, 668-69].

When Plaintiff presented to the VA Medical Center for follow-up on April 22, 2016, she reported that she was feeling well and denied breathing problems. [R651]. She admitted that she had been taking her medications intermittently and was "trying to be better" about taking her diuretics regularly, but she did not use her CPAP machine regularly. [R651]. She felt anxious about a new nodular lesion that had been found on her lung and new small pleural effusion. [R651-52]. Examination was normal, despite her noncompliance. [R653]. She was advised to be compliant with her diuretics and was warned that she could end up in life-threatening situations if she did not use them regularly. [R653].

_____

[29] BNP is a hormone that rises during heart failure. Nat'l Heart, Lung, & Blood Institute, Heart Failure, https://www.nhlbi.nih.gov/health-topics/heart-failure (last visited 3/11/19).

AO 72A
(Rev.8/8
2)

Also on April 22, 2016, Dr. Tong stated that Plaintiff had a 100 percent VA disability rating due to her cardiovascular impairments (ventricular arrhythmias (sustained)), with post-traumatic stress disorder ("PTSD") rated at 30 percent, lumbosacral or cervical strain at ten percent, superficial scars at ten percent, tendon inflammation at ten percent, and cervix disease or injury rated at zero. [R632].

At a follow-up visit to the VA Medical Center cardiology clinic on April 28, 2016, Plaintiff denied that she had been noncompliant with medication since her ER and primary care visits, but she reported wheezing, sluggishness, weakness, and stumbling. [R644-45, 650]. She had multiple blood pressure readings, which were recorded as 84/54, 88/59, 92/61, 86/57, showing relative hypotension. [R649-50]. It was noted that her refill history was consistent with noncompliance. [R647]. She was diagnosed with congestive heart failure, [R628]; her medications were decreased to get a better sense of her blood pressure off medications, [R647, 649]; her metoprolol was decreased, [R647]; her losartan was stopped, [R647]; and she was to continue Lasix and was told she could take it daily for a couple days to help with swelling, [R648]. An addendum to the note indicates that on her prior ER visit, she had not taken her blood-pressure medication, but now that she had taken it, she was hypotensive, and a reduction of her blood-pressure medication was recommended. [R649].

AO 72A
(Rev.8/8
2)

On May 2, 2016, Plaintiff was seen at Gwinnett Medical Center for shortness of breath, cough, and wheezing. [R688]. Plaintiff reported that her blood pressure had been low and that her medicine had been decreased by her regular doctor at the VA. [R688, 704]. Examination showed a few scattered rhonchi,[30] but no significant rales and no edema. [R704]. The impression was dyspnea, bronchospasm, and history of heart failure. [R704]. An EKG was abnormal, showing possible left atrial enlargement and nonspecific T wave abnormality. [R703]. Chest x-rays showed mild heart failure exacerbation with bronchospasm and borderline-to-mild cardiomegaly,[31] with no acute findings. [R706-07]. Her primary diagnosis was mild congestive heart failure exacerbation, [R690], and treatment was aimed at managing her symptoms of heart failure, [R696]. She was discharged with potassium and an inhaler, [R700], and her Lasix dose was increased to two per day for three days, [R706].

---

[30] A rhonchus is an added sound with a musical pitch occurring during inspiration or expiration, caused by air passing through narrowed bronchi. Rhonchus, *PDR Med. Dictionary* 1547 (1st ed. 1995).

[31] Cardiomegaly indicates an enlarged heart. Mayo Clinic, Enlarged Heart, https://www.mayoclinic.org/diseases-conditions/enlarged-heart/symptoms-causes/syc-20355436 (last visited 3/11/19).

AO 72A
(Rev.8/8
2)

A May 3, 2016, transthoracic echocardiogram revealed that Plaintiff's ejection fraction was reduced to 20 to 25 percent with severe global hypokinesis[32] of the left ventricle, borderline right-ventricle systolic function, and moderate mitral and tricuspid regurgitation.  [R590].

### E.    *Vocational-Expert Testimony*

A vocational expert (VE") testified at the hearing before the ALJ that Plaintiff has past sedentary skilled work as a claims examiner, [R71], and an administrative assistant, [R73-75].  When asked about the working capabilities of a person of Plaintiff's age, education, and work experience, who is able to perform light work as defined by the regulations and further limited to never climbing ropes, ladders, or scaffolds; occasionally climbing ramps and stairs; frequently balancing; and occasionally stooping, kneeling, crouching and crawling, the VE said that such an individual could perform both of Plaintiff's past jobs, as well as other light, unskilled jobs such as linen load builder, mailroom clerk, and photocopy machine operator. [R75-76].  The VE further testified that if an individual needed to lie down for an hour during the eight-hour workday, no jobs could be performed.  [R76].

---

[32]    Hypokinesis refers to diminished or slow movement.  Hypokinesis, *PDR Med. Dictionary* 836 (1st ed. 1995).

AO 72A
(Rev.8/8
2)

## V.    ALJ'S FINDINGS

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant last met the insured status requirements of the Social Security Act on March 31, 2016.

2.    The claimant did not engage in substantial gainful activity during the period from her alleged onset date of March 6, 2011 through her date last insured of March 31, 2016 (20 CFR 404.1571 *et seq*.).

3.    Through the date last insured, the claimant had the following severe impairments: Angina/Chest Pain; Cardiomyopathy; Coronary Artery Disease; Chronic Heart Failure; Sleep Apnea; Obesity; and Mild Degenerative Disk Disease of Her Cervical Spine (20 CFR 404.1520(c)).

. . .

4.    The claimant's conditions of hypertension, hyperlipidemia, anxiety, and a posttraumatic stress disorder are non-severe impairments under the Act and Regulations (20 CFR 404.1520(c)).

. . .

5.    Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

. . .

6.    After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the

AO 72A
(Rev.8/8
2)

residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) with additional limitations. The claimant can perform work that never requires her to climb ropes, ladders, or scaffolds. Additionally, the claimant can occasionally climb ramps and stairs. The claimant can frequently balance. She can also occasionally stoop, kneel, crouch, and crawl. Furthermore, she can perform work that does not require her to drive as a regular part of her job duties.

. . .

7.  Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

. . .

8.  The claimant was born on March 6, 1964 and was 52 years old, which is defined as a younger individual age 18-49 [sic], on the date last insured. The claimant subsequently changed age category to closely approaching advanced age (20 CFR 404.1563).

9.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

10. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

11. Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

AO 72A
(Rev.8/8
2)

. . .

> 12. The claimant was not under a disability, as defined in the Social Security Act, at any time from March 6, 2011, the alleged onset date, through March 31, 2016, the date last insured (20 CFR 404.1520(g)).

[R24-40].

The ALJ explained, in relevant part, that Plaintiff reported that she retained the abilities to do various activities, "which greatly undermines the conclusion that her conditions significantly reduced her functionality." [R26]. She also noted that a consultative physician and psychologist concluded that Plaintiff displayed signs of adequate grooming and hygiene, an appropriate mood and affect, a normal range of affect, an energy level and processing speed that appeared to be within normal limits, and signs of thoughts that were organized, logical, and relevant to the situation; appeared alert and oriented; maintained appropriate eye contact; and displayed no signs of depression, anxiety, or memory problems. [R26]. The ALJ additionally explained that she gave "some weight" to the consultative opinion of Dr. Strawbridge, as the ALJ found that Plaintiff had additional limitations not included in Dr. Strawbridge's opinion; and she gave "significant weight" to the opinion of Dr. Lewis, except for the limitation to one- and two-step instructions, based on Plaintiff's unremarkable clinical

32

signs and Plaintiff's reports of various activities. [R34-35]. The ALJ also explained that she found Plaintiff's claims of limitations less than fully credible and that she gave "some weight" to the August 2014 medical-source statement completed by Dr. Tong[33] and "little weight" to Dr. Tong's April 2016 opinion because she found them inconsistent with Plaintiff's reports in May 2013 and January 2014 that her symptoms were improving and she was feeling well, sleeping well, and feeling rested; her May 2013 report that she had been in New York caring for an uncle; normal/mild findings appearing in the objective medical record; Plaintiff's reports that she was able to perform numerous activities; and the inconsistency between Plaintiff's claims of limitation and her failure to comply with prescribed medications. [R34-37]. Finally, the ALJ explained that she relied on the testimony of the VE in concluding that Plaintiff was capable of making a successful adjustment to other work that existed in significant numbers in the national economy, such as linen loader, mail clerk, and photocopy-machine operator. [R39-40].

---

[33] As Plaintiff points out, [Doc. 10 at 10], and Defendant does not contest, [*see generally* Doc. 11], the medical-source statement is misidentified in the ALJ's decision as having been completed by a Elizabeth Joy, M.D. [*Compare* R34 *with* R544]. Plaintiff does not contend that the ALJ reversibly erred in misidentifying the source of the statement. [*See generally* Doc. 10].

## VI.    CLAIMS OF ERROR

Plaintiff contends that the ALJ erred in her consideration of and reliance upon Plaintiff's "occasional" noncompliance with medical treatment in discounting Dr. Tong's opinions and Plaintiff's testimony regarding her limitations. [Doc. 10 at 7-24 (citing 20 C.F.R. § 404.1530; Social Security Ruling ("SSR") 82-59[34]; SSR 16-3p)].  She also argues that the ALJ disregarded material evidence and that the ALJ's other reasons for discounting Dr. Tong's opinions and Plaintiff's testimony regarding her limitations are not supported by substantial evidence. [Doc. 10 at 24-26].

---

[34]     Social Security Rulings are published under the authority of the Commissioner of Social Security and are binding on all components of the administrative process.  *Sullivan v. Zebley*, 493 U.S. 521, 530 n.9 (1990); *Tauber v. Barnhart*, 438 F. Supp. 2d 1366, 1377 n.6 (N.D. Ga. 2006) (Story, J.) (citing 20 C.F.R. § 402.35(b)(1)).  Although SSRs do not have the force of law, they are entitled to deference so long as they are consistent with the Social Security Act and regulations.  *Massachi v. Astrue*, 486 F.3d 1149, 1152 n.6 (9th Cir. 2007); *see also Salamalekis v. Comm'r of Soc. Sec.*, 221 F.3d 828, 832 (6th Cir. 2000) ("If a Social Security Ruling presents a reasonable construction of an ambiguous provision of the Act or the agency's regulations, we usually defer to the SSR."); *Minnesota v. Apfel*, 151 F.3d 742, 748 (8th Cir. 1998) ("Social Security Rulings, although entitled to deference, are not binding or conclusive."); *Pass v. Chater*, 65 F.3d 1200, 1204 n.3 (4th Cir. 1995); *Gordon v. Shalala*, 55 F.3d 101, 105 (2d Cir. 1995); *Andrade v. Sec'y of Health & Human Servs.*, 985 F.2d 1045, 1051 (10th Cir. 1993).

AO 72A
(Rev.8/8
2)

### A. *Plaintiff's Representations Regarding Noncompliance*

As an initial matter, the Court finds it notable that while Plaintiff characterizes her noncompliance with treatment as "occasional," [Doc. 10 at 7, 11, 21, 23], or "intermittent," [*id*. at 21, 23, 24], the record suggests that it was her *compliance* that was intermittent. To wit, review of the portions of the record cited by Plaintiff herself reveals at least eight references to noncompliance or lack of interest in pursuing treatment options. [*See, e.g.*, R359 (1/24/13 note that Plaintiff admitted she was only intermittently compliant with medication and was not taking her statin); R352-54 (4/29/13 note that Plaintiff was out of digoxin); R331 (7/11/13 note that Plaintiff did not want to try a new medication); R304 (12/11/13 note that Plaintiff had stopped her medications because she was "doing a cleanse"); R423 (3/16/14 note that Plaintiff did not want to try a new medication); R662, 668 (4/18/16 notes that Plaintiff had not taken Lasix recently, had not taken her metoprolol that day, and was erratic in taking her diuretics); R651 (4/22/16 notes that Plaintiff admitted that she did not use her CPAP machine regularly, had been taking her medications intermittently, and was "trying to be better" about taking her diuretics regularly); and R647, 649 (4/28/16 notes that Plaintiff's refill history was consistent for noncompliance and that on her prior emergency-room visit, she had not taken her blood-pressure medication)].

35

Additionally, the records Plaintiff cites to show that she was sometimes compliant with medication either rely on her self-report of compliance, [R336 (cited at [Doc. 10 at 13]); R644-45, 650 (cited at [Doc. 10 at 18])], or do not in fact contain any representations or findings regarding compliance, [R430 (cited at [Doc. 10 at 15]); R292, 298-300, 328, 380, 420, 524, 526, 539 (cited at [Doc. 10 at 20])], save one March 2014 record that stated that her ejection fraction improved after she started medication for congestive heart failure, [R423, 528-29 (cited at [Doc. 10 at 20])], and an April 2016 record where Plaintiff's low blood pressure implies that Plaintiff was taking blood-pressure medication at that time, [R650 (cited at [Doc. 10 at 20])].

Despite Plaintiff's exaggeration, the Court will consider Plaintiff's arguments that the ALJ reversibly erred in her consideration of and reliance upon Plaintiff's noncompliance as it actually appears in the record.

### B.     *Violation of SSR 82-59 (Failure to Follow Prescribed Treatment)*

The Court first considers Plaintiff's argument that the ALJ reversibly erred by failing to satisfy the elements of Ruling 82-59. Presuming, as Plaintiff urges, that the ALJ reached her decision of non-disability based exclusively on Plaintiff's noncompliance with medication, the ALJ would have reversibly erred. Under Ruling 82-59, a disability claim may not be denied on grounds of the claimant's failure

AO 72A
(Rev.8/8
2)

to follow treatment unless a determination is first reached that the claimant's impairment is disabling within the context of the regulations; the treatment has been prescribed by a treating source and is "clearly expected" to restore the claimant's ability to work; the claimant has been given notice of the purported noncompliance and its potential effect on her eligibility for benefits; and the claimant has been given an opportunity to cure the noncompliance by taking the prescribed treatment or to show justifiable cause for failing to do so; and the claimant has not cured the noncompliance or provided justifiable cause for failing to follow prescribed treatment. SSR 82-59, 1982 WL 31384 at *1-*5; *see also* 20 C.F.R. § 404.1530 (Need to Follow Prescribed Treatment). As Plaintiff points out, the ALJ did not make a finding that Plaintiff was disabled within the context of the regulations and that the medication that had been prescribed for Plaintiff could restore her ability to work. [*See generally* R21-40].

In her decision, however, the ALJ expressly acknowledged the requirements of SSR 82-59 and explained that she did *not* base her determination of non-disability on Plaintiff's failure to follow her physicians' treatment recommendations but instead found that Plaintiff's noncompliance with recommended treatment was one of several reasons that she gave little weight to Plaintiff's allegations of disabling symptoms. [R37-38]. Plaintiff questions the truthfulness of the ALJ's explanation but provides the

37

Court with no legal authority under which it might presume that the ALJ's plainly stated reasons for her decision are false. [*See* Doc. 10 at 21]. The Court therefore finds no basis for reversal in Plaintiff's argument that the ALJ did not meet the requirements set forth in SSR 82-59.

### C. Weight Assigned to Opinion of Dr. Tong and Plaintiff's Allegations of Limitation

When a claimant asserts disability through testimony of pain or other subjective symptoms, and shows, as Plaintiff has here, that her medically determinable impairments could reasonably be expected to cause her alleged symptoms, [R37], the ALJ must then consider the plaintiff's subjective complaints, SSR 16-3p,[35] 2016 WL 1119029 at *2-*3; *James v. Barnhart*, 261 F. Supp. 2d 1368, 1372 (S.D. Ala. 2003) (citing *Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992))). In doing so, the ALJ considers the lay evidence, medical opinions, and objective medical evidence; the claimant's daily activities; the location, duration, frequency, and intensity of the pain or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication taken to alleviate the pain or other

---

[35] SSR 16-3p superseded SSR 96-7p, as of March 28, 2016. SSR 16-3p (Mar. 16 & 24, 2016). It eliminates the use of the term "credibility" in order to clarify that "subjective symptom evaluation is not an examination of an individual's character." SSR 16-3p, 2016 WL 1119029 at *1.

AO 72A
(Rev.8/8
2)

symptoms; other treatment received for the pain or other symptoms; any measures used to relieve the pain or other symptoms; and other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c); SSR 16-3p, 2016 WL 1119029 at *2-*4, *7-*8. When a claimant's subjective testimony is supported by medical evidence that satisfies the pain standard, she may be found disabled. SSR 16-3p, 2016 WL 1119029 at *2; *Foote*, 67 F.3d at 1561; *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). If the ALJ determines, however, that claimant's testimony is not credible, "the ALJ must show that the claimant's complaints are inconsistent with his testimony and the medical record," *Rease v. Barnhart*, 422 F. Supp. 2d 1334, 1368 (N.D. Ga. 2006), and if the ALJ refused to credit subjective pain testimony where such testimony is critical, she must articulate specific reasons for questioning the claimant's credibility, *Walker*, 826 F.2d at 1004. *Accord* SSR 16-3p, 2016 WL 1119029 at *9-*10. After considering a claimant's complaints of pain or other subjective symptoms, the ALJ may reject them as not credible, and that determination will be reviewed for substantial evidence. *Wilson v. Heckler*, 734 F.2d 513, 517 (11th Cir. 1994).

In the same vein, where an ALJ gives the opinion of a treating physician less than substantial or controlling weight, she must clearly articulate reasons establishing good

AO 72A
(Rev.8/8
2)

cause for doing so. 20 C.F.R. § 404.1527(c)(2); *Somogy v. Comm'r of Soc. Sec.*, 366 Fed. Appx. 56, 63 (11th Cir. Feb. 16, 2010) (citing *Lewis*, 125 F.3d at 1440)); SSR 96-2p, 1996 WL 374188.[36] Good cause exists when: (1) the treating physician's opinion was not bolstered by the evidence; (2) the evidence supported a contrary finding; or (3) the treating physician's opinion was conclusory or inconsistent with the doctor's own medical records. *Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004).

Plaintiff argues that the ALJ ignored evidence that by September 2013, Plaintiff was easily tired, [R292]; that in December her energy was zapped, [R305]; that by March 2014, she sought a sleep study because of fatigue and was found to have sleep apnea, [R420, 524, 526]; that she was compliant with her medication, [R430]; that in April 2014, she was advised to take sublingual nitroglycerine for chest pain, [R530]; that in August 2014, Dr. Tong opined that Plaintiff needed to lie down due to her symptoms, [R544]; that Plaintiff's condition worsened in mid-April 2016, [R631, 748]; that "despite compliance" by the end of April 2016, Plaintiff was wheezing, sluggish and weak, [R645, 763-64]; that a May 2016 echocardiogram showed an ejection

---

[36]    This standard applies to claims filed, as Plaintiff's was, on or before March 26, 2017. *See* Rescission of Social Security Rulings 96-2p, 96-5p, and 06-3p. 2017 WL 3928298, at *1.

40

AO 72A (Rev.8/82)

fraction of 20 to 25 percent and severe left ventricular global hypokinesis, [R590, 624-27, 728-29]; and that Plaintiff testified that she was not always compliant with medication because it caused her normal blood pressure to drop into the "danger zone" and because her diuretics caused frequent urination. [Doc. 10 at 23, 25]. Plaintiff also suggests that the ALJ relied too heavily on Plaintiff's reported activities of daily living, pointing out that the Eleventh Circuit has stated that it did not believe that " 'participation in everyday activities of short duration, such as housework or fishing, disqualifies a claimant from disability.' " [*Id.* at 25-26 (quoting *Lewis*, 125 F.3d at 1441)].

Reference to the ALJ's decision, however, reveals that the ALJ did in fact consider Plaintiff's testimony that she took diuretic medications and had to use the bathroom frequently, [R29]; note Plaintiff's reports of fatigue, [R29-31]; discuss Plaintiff's sleep apnea and find it to be a severe impairment, [R24, 29, 31]; discuss both of Dr. Tong's opinions, [R34-35]; acknowledge that Plaintiff reported in April 2016 that she experienced worsening wheezing during the six weeks preceding the examination, [R32]; and consider that a May 2016 echocardiogram showed an ejection fraction of 20 to 25 percent and severe left ventricular global hypokenesis, [R33]. The ALJ also explained that she found Plaintiff's claims of limitations less than fully

41

credible and that she gave only "some weight" to Dr. Tong's August 2014 medical-source statement and "little weight" to Dr. Tong's April 2016 opinion based not only on Plaintiff's noncompliance and her own statements regarding her activities, but also on specific medical findings and opinions: Dr. Luster's August 2012 findings that Plaintiff had a regular rate and rhythm with normal heart sounds, clear lungs, normal extremity joints, a normal, non-tender spine, a normal straight-leg raising examination, no edema, and slightly diminished pulses in her extremities, [R298-300]; notes from a January 2013 visit to the VA indicating that Plaintiff's heart and lung readings were normal, she had no edema, and she admitted to being intermittently compliant with her medications and to not taking her statin, [R359, 361]; notes from a May 2013 visit to the VA indicating that a myocardial perfusion study yielded normal results and that Plaintiff reported that she had been in New York caring for an uncle, [R336]; notes from a July 2013 visit to the VA indicating that although Plaintiff was affected by coronary artery disease and chronic heart failure, her lungs were clear, she had a normal heart rate and sounds, she had no pedal edema, her hypertension was well controlled, and she was stable, [R331]; Dr. Luster's December 2013 findings that although Plaintiff displayed signs of 1+ to 2+ edema in the lower extremities, her heart sounds were normal, her lungs were clear, and her chest was normal in shape and

42

expansion, [R304]; Plaintiff's reports in May 2013 and January 2014 that her symptoms were improving, she was feeling well, sleeping well, and feeling rested, and she was not having chest pain, shortness of breath, or palpitations, [R306, 336]; Plaintiff's February 2014 report that she drove, shopped for groceries, did chores, albeit slowly, and needed no assistance in managing her activities of daily living, [R227-31]; Plaintiff's February 2014 report that she could lift and carry forty pounds, [R236]; Plaintiff's March 2014 report to Dr. Kaebnick that she was "doing well" and that her pain was "not very limiting in her daily life," [R420]; March 2014 notes indicating that sleep testing revealed that Plaintiff had a "good response" to CPAP treatments, [R407]; Plaintiff's March 2014 report to Dr. Strawbridge that she was able to independently dress, feed herself, use the toilet, clean, do laundry, iron, prepare meals, and shop, and Dr. Strawbridge's opinion that Plaintiff need only avoid excessive bending and heavy lifting, [R430, 432]; Plaintiff's March 2014 report to Dr. Lewis that she did not need assistance managing her activities of daily living, cooked and did chores on a regular basis, could shop and manage money, paid her bills online, drove several times per week to shop, go to appointments, and run errands, could navigate public transportation without assistance, attended church, attended choir rehearsal once per week, and did not need to consult with others for decision making, organizing, or planning, [R438];

AO 72A
(Rev.8/8
2)

Dr. Lewis's March 2014 opinion that Plaintiff's activities of daily living were not consistent with her report of symptoms and that she essentially retained most of her functionality despite her conditions, [R439-40]; VA notes from April 18, 2016, indicating that Plaintiff had admitted to doubling her dose of Lasix that morning after not having recently taken it, to having skipped taking her metoprolol that day, and to being erratic in taking her diuretics, [R662, 668]; VA notes from April 28, 2016, noting that Plaintiff's refill history was consistent with noncompliance and recounting that Plaintiff had previously admitted to noncompliance with CPAP and medications but was that day denying having reported any noncompliance, [R645, 647, 764, 766]; a May 2016 examination showing that Plaintiff had a normal cardiovascular system, a respiratory system with a few scattered rhonchi, no edema, stable vital signs, and no signs of distress, and x-rays leading to the conclusion that Plaintiff had "mild" cariomegaly without acute findings, [R704, 706-07]; and Plaintiff's May 2016 testimony that she could drive, do household chores, shop for groceries, and attend doctors' appointments, [R68].  [R27, 29-37].  And while it appears to be true that the ALJ did not expressly note that in April 2014, Plaintiff had been advised to take sublingual nitroglycerine if her chest pain recurred, [R530], or that Plaintiff testified that she did was not always compliant with medication because it dangerously reduced

44

her normal blood pressure, [R66], there is no rigid requirement that the Commissioner specifically refer to every piece of evidence in the decision, so long as the decision is not a broad rejection which is not enough to enable the court to conclude that the Commissioner considered the claimant's medical condition as a whole. *Moncrief v. Astrue*, 300 Fed. Appx. 879, 881 (11th Cir. Dec. 1, 2008) (citing *Dyer*, 395 F.3d at 1211) (affirming ALJ's decision despite plaintiff's contention that the ALJ had ignored evidence favorable to her); *see also McLain v. Comm'r, Soc. Sec. Admin.*, 676 Fed. Appx. 935, 937 (11th Cir. Jan. 20, 2017) (citing *Mitchell v. Comm'r, Soc. Sec. Admin.*, 771 F.3d 780, 782 (11th Cir. 2014) (same)). It also bears noting that Plaintiff points to only one record of hypotension and a resulting adjustment of medication, [R647, 649 (cited at [Doc. 10 at 20])], amid copious evidence, discussed by the ALJ, that Plaintiff had and was being treated for high blood pressure, [*see, e.g.*, R24, 30, 32, 50, 92, 111, 218, 221, 312, 314, 329, 336, 339, 359, 361, 373, 421, 430, 432, 527, 645, 687, 690, 695, 704, 764], and, as discussed above, the record contains very little evidence of compliance with treatment, *see supra* Part VI.A. The Court finds that the ALJ's express references to Plaintiff's subjective allegations and reports of her capabilities, the myriad medical opinions, and the VA medical records, along with the

45

RFC's exertional and postural limitations and restriction from jobs requiring driving, are sufficient to show that the ALJ considered Plaintiff's medical condition as a whole.

## VII.  CONCLUSION

For the reasons above, the Court **AFFIRMS** the final decision of the Commissioner.    The Clerk is **DIRECTED** to enter final judgment in the Commissioner's favor.

**IT IS SO ORDERED and DIRECTED**, this the 11th day of March, 2019.

ALAN J. BAVERMAN
UNITED STATES MAGISTRATE JUDGE

46

AO 72A
(Rev.8/8
2)